# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


RICHARD A. HADSELL,

                    Plaintiff,

vs.                                    Case No.: 12-CV-0235-L-RBB

MANDARICH LAW GROUP, LLP, AND
CACH, LLC,

                    Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~



Deposition of MAGIC WEST

September 26, 2012

San Diego, California



Reported by: Angie Schultz-Messenger, CSR No. 11742

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    RICHARD A. HADSELL,

5                         Plaintiff,

6    vs.                              Case No.: 12-CV-0235-L-RBB

7    MANDARICH LAW GROUP, LLP, AND

8    CACH, LLC,

9                         Defendants.
     ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

10

11

12

13

14

15           Deposition of MAGIC WEST, taken on behalf of

16   Plaintiff, commencing on Wednesday, September 26,

17   2012, at 10:00 a.m., taking place at 701 B Street,

18   Suite 1115, San Diego, California , before

19   Angie Schultz-Messenger, Certified Shorthand Reporter,

20   certificate number 11742.

21

22

23

24

25

Magic West                                    Hadsell v. Mandarich Law Group, LLC

1                    APPEARANCES OF COUNSEL

2     FOR PLAINTIFF:

3              HYDE & SWIGART
               BY: JOSHUA B. SWIGART, ESQ.
4              411 Camino Del Rio South
               Suite 301
5              San Diego, California 92108
               (619)233-7770
6

7     FOR DEFENDANTS:

8              MESSER & STILP, LTD.
               BY: NICOLE STRICKLER, ESQ.
9              166 West Washington
               Suite 300
10             Chicago, Illinois 60602
               (312)334-3442
11

12    FOR PLAINTIFF:

13             KAZEROUNI LAW GROUP, APC
               BY: ABBAS KAZEROUNIAN, ESQ.
14             2700 North Main Street
               Suite 1000
15             Santa Ana, California 92705
               (800)400-6808

16

17

18

19

20

21

22

23

24

25

1                    DEPOSITION OF MAGIC WEST

2                        September 26, 2012

3

4                          MAGIC WEST,

5         having been duly sworn, testified as follows:

6                          EXAMINATION

7    BY MR. SWIGART:

8         Q.    All right.   Good morning, Mr. West.   I know

9    we've been introduced many times in the past.   I

10   believe you've given deposition in this case in the

11   state-related matter, but if we could go through the

12   drill.   If you wouldn't mind stating your name.

13        A.    Yes.   It's Magic, M-a-g-i-c, last name is

14   West, W-e-s-t.

15        Q.    Okay.   And I understand you're being

16   produced here today on behalf of -- a corporate

17   representative of CACH, LLC; is that correct, sir?

18        A.    That is correct.

19        Q.    Okay.   Make sure I have the right deposition

20   notice.   Let me mark as Exhibit 1 what will be the

21   deposition notice for CACH.

22            (Exhibit 1 was marked for identification.)

23   BY MR. SWIGART:

24        Q.    If you want to take a look at that, sir.

25   You had an opportunity to review that?

Hadsell v. Mandarich Law Group, LLC

1      A.    Yes, I did.

2          Q.    Okay.  Before we get into that, I know we've

3      met each other and been involved in depositions many,

4      many times and on many different cases.  I assume we

5      can dispel with the admonitions.  You understand the

6      procedure here today?

7          A.    Yes.

8          Q.    This is a federal case, but the procedure is

9      basically the same as in state court.  If you have any

10     problems with the questions I ask, you can't

11     understand them, I might think they're good questions,

12     they may not be, just tell me to correct it or tell me

13     you don't understand, and I'll rephrase it.  Okay?

14         A.    Not a problem.

15         Q.    Any reason today you can't give your best

16     testimony, lack of sleep, medications, something like

17     that?

18         A.    No.

19         Q.    Okay.  So Exhibit number 1 is a deposition

20     notice in this case.  You had an opportunity to review

21     that.  Is there any topics that you're not able to

22     give testimony on?

23         A.    No.

24         Q.    Okay.  Perfect.  Let's just attach Exhibit

25     number 2 collectively.

1      MR. SWIGART:  I have another copy here for

2  you, Nicole.

3      MS. STRICKLER:  Great.

4      (Exhibit 2 was marked for identification.)

5      MR. SWIGART:  Exhibit number 2 I will just

6  mark collectively as all the documents that have been

7  produced by the defendants, including CACH, in this

8  case.  I think they're Bates stamped.  Let me just

9  note for the record that I think around 80 something,

10  maybe 82, 83, those documents are stamped

11  confidential; so while I will attach them to the

12  transcript, we'll go ahead and treat them -- I know we

13  have a protective order that should be filed fairly

14  soon, so I agree to keep those confidential entering

15  the transcript, at least as of those portions and the

16  testimony surrounding that as such.  Okay?

17      All right.  Let me get you a copy, Nicole, so you

18  can follow along.  There you go.

19      MS. STRICKLER:  Thank you.

20      MR. SWIGART:  You bet.

21  BY MR. SWIGART:

22      Q.   All right.  Now, I know you gave some

23  testimony with regard to this case in the state case,

24  so we can kind of truncate some of this.  If we can

25  just flip to the second page, on the bottom right-hand

1    corner there's a number.  I think your attorneys have

2    Bates stamped that, starts with RH and a number.  I'll

3    probably just refer to the page number as we go

4    through it.  So this one would be 2.  Do you see that?

5         A.   Yes, I do.

6         Q.   Okay.  And my understanding is that pages --

7    I guess we'll start with 3 through 6.  That's a copy

8    of the state court complaint that was filed.

9         A.   Yes.  It's what it appears to be.

10        Q.   Okay.  Perfect.  So I might jump around a

11   little bit.  But if you need to reference some of the

12   other documents are produced, fair enough.  I'm not

13   trying to trip you up here.  Just trying to get a

14   little bit more concrete understanding of what

15   happened and when.

16        My understanding, the state court complaint was

17   filed on behalf of CACH by its attorneys, Mandarich

18   Law Group, on December 29, 2011.

19        A.   That's my understanding as well.

20        Q.   Okay.  All right.  So just going through the

21   complaint kind of as a reference, I just had some

22   questions.  In paragraph 1, says that the original

23   creditor is MBNA America, N.A.  Do you see that, sir?

24        A.   Yes, I do.

25        Q.   Do you have any reason to believe that's

Magic West                                    Hadsell v. Mandarich Law Group, LLC

1    correct?

2         A.    Yes.

3         Q.    Okay.  What would your basis be to believe

4    that the original creditor in the case is MBNA

5    American N.A.?

6         A.    MBNA merged into Bank of America and became

7    FIA Card Services, and FIA Card Services is a wholly

8    unsubsidiary of Bank of America, and that's who we do

9    business with.  That's where the chain of title for

10   this account was sold from Bank of America/FIA to

11   CACH.

12        Q.    Okay.  So if I understand your testimony

13   correctly, CACH got this account that underlies the

14   state court case from FIA?

15        A.    Correct.

16        Q.    Okay.  And just so it's clear for the

17   record, I know you and I both know the answer to this,

18   CACH and FIA, totally different companies?

19        A.    That's correct.

20        Q.    You don't work for FIA?

21        A.    No, I do not.

22        Q.    Never worked for FIA?

23        A.    Never.

24        Q.    How about Bank of America, never worked for

25   them?

1    it's there, then that's when we review it.

2         Q.    But based on your knowledge and experience

3    and working at CACH for -- how many years was it

4    again?

5         A.    Almost five.

6         Q.    Five years.  You're familiar that in every

7    account that you review there's at least a column that

8    exists that would show when any statements were

9    received, if there were any received on an account?

10        A.    Yes.  I just didn't commit it to memory, and

11   I didn't write it down, so --

12        Q.    Okay.  Sure.  And that -- would that seem --

13   would that same line of questioning apply to the

14   affidavit of sale, would there be a column that would

15   indicate when it was received?

16        A.    Yes, because there's a section that

17   indicates what documentation has been requested, and

18   it's a status.  Status is usually just either

19   requested, not available or received.  And then when

20   it's received, that's where the column for the actual

21   date would fit.

22        Q.    Okay.  And would that apply also to the bill

23   of sale?

24        A.    I've never noticed it on the bill of sale.

25   There might have been a date when it scanned into the

1   system.   But the bill of sale we get when we purchase

2   the batch.   That's not after the fact.   That's at the

3   time of the transaction between CACH and FIA Card

4   Services/Bank of America, however you want to phrase

5   it.

6       Q.    Fair enough.   And you got a -- use the

7   word -- common vernacular -- some type of rolling

8   production of these statements.   Day one you -- maybe

9   you get the first statement and somewhere down the

10  line you get some more statements.   Would there be

11  some type of documented chronology as to when these

12  periodic statements were received?

13      A.    Again, going to that received column, you

14  would see different dates, so you'd be able to pick it

15  apart that way, that maybe three statements came in on

16  such and such date, maybe another two statements came

17  in couple weeks later.   It's when we receive it.   Then

18  there's a little bit of a lag time as to when it's

19  actually scanned into the system, again, because of

20  the volume we're dealing with.

21      I'm looking at it at the back end of just

22  reviewing the scanned documentation.   So I can't tell

23  you exactly how long that lag would be.   My

24  understanding is it's fairly quickly.   But there can

25  be -- when they scan it in is when it gets the

1    received date, is populated.

2        Q.    Fair enough.  And again, I'm not trying to

3    play hide the ball here.  And I'll tell you precisely

4    what I'm looking for.  But looking through these

5    documents, I did see exactly what you're testifying

6    to.  There's a bill of sale, loan schedule, affidavit

7    on the account, some account statements.

8        But what I see missing -- and perhaps you can

9    look through and maybe I'm missing it -- is the terms

10   and conditions that related to the account.  Would you

11   mind looking through to see if I missed it or in fact

12   it's not there.

13       A.    Just double-checking, but I don't recall

14   seeing that in the computer either when I reviewed the

15   account.  Yeah, I don't recall seeing it attached to

16   this particular account.

17       Q.    Okay.  So there's a two-part question.  The

18   documents in front of you attached as Exhibit number

19   2, it would be a correct statement saying you don't

20   see the terms and conditions that would be associated

21   with any of the account numbers?

22       A.    Not anything more than what would be

23   included on the second page which is a synopsis of the

24   major terms and conditions.

25       But as far as the separate card member agreement,

1    which is what we usually refer to it as, no, we don't

2    have that.

3           Q.    When you say "second page," you're referring

4    to the second page on each periodic statement?

5           A.    Yes.  I'm sorry.  I should have been more

6    specific.  Bank of America makes a habit of providing

7    a second page to most statements which will indicate

8    some of the terms and conditions for the account.

9           Q.    Understood.  So aside from reviewing Exhibit

10   number 2 that's in front of you, you've had an

11   opportunity to go back and review CACH's internal

12   records on certain account notes and other various

13   data that may not be present in front of you in

14   Exhibit number 2, correct?

15          A.    Correct.

16          Q.    And based on your review of that, were you

17   able to find the existence of a terms and conditions

18   page or pages?

19          A.    Not that I saw on this particular account.

20          Q.    Okay.  Do you have any idea if CACH has

21   requested that from FIA or any of its affiliates?

22          A.    I didn't see it listed, and that's all I can

23   really say.  I don't know why it wasn't listed or if

24   it wasn't listed or if it was requested or not.  I

25   can't speak to more than what I've reviewed on the

1    account in our computer system.

2        Q.    Okay.   And I know this might be somewhat of

3    a repetitive question, but there's a difference.   You

4    weren't able to find the terms and conditions page or

5    pages that associated with this account from MBNA

6    either, were you?

7        A.    Not that I saw, no.   I haven't seen a terms

8    and conditions attached in our computer from MBNA or

9    Bank of America.

10       Q.    That would also include Fleet Bank?

11       A.    Yes.

12       Q.    Okay.   All right.   Let's go back to the

13   complaint.   We'll just do it as of now.   So paragraph

14   1 there's a statement in there, and I'm summarizing

15   it, that the original creditor was MBNA America N.A.

16   We asked questions about that a few minutes ago, if

17   you recall.   What's your basis for knowledge that

18   that's correct?

19       A.    It's through my training that I know that's

20   correct.   I haven't personally looked it up on the SCC

21   Web site or the federal agency that tracks it, but I'm

22   sure you can find it there as well, of the merger.

23       Q.    Understand.   So stepping aside from the

24   merger -- and I take your word for it.   I think you're

25   more familiar than I am with the acquisition of Bank

1    of America and how CACH gets its accounts.

2         But what I'm asking specifically is:  What's your

3    basis of knowledge that Mr. Hadsell had an account

4    with MBNA?

5         A.   With MBNA, I can't really speak to.  I

6    wasn't there when he personally requested a line of

7    credit.  It would have to be -- after the merger would

8    be the only information that I would have, because

9    I've never been trained by MBNA.  As I stated, I never

10   worked for them, so I wouldn't be able to testify to

11   that one way or the other.

12        Q.   Okay.  And let me follow up with that.  Do

13   you have any documents, Exhibit number 1, I assume

14   not, just the deposition notice, but specifically

15   Exhibit number 2, that would support the fact of your

16   belief that Mr. Hadsell had an account with MBNA?

17        A.   Other than the fact that the account was

18   open until 2011.  But, I mean, I just want to see if

19   the -- yeah, also the affidavit of sale, paragraph 3.

20        Q.   Okay.  So let's flip to that real quick.

21   Page 21?

22        A.   That is correct.  Sorry.

23        Q.   All right.  And what portion or portions are

24   you referring to?

25        A.   Paragraph 3 that FIA Card Services N.A. is a

1    wholly unsubsidiary of Bank of America Corporation and

2    its successor in interest to MBNA America N.A., Fleet

3    Bank, parentheses (RI), and Bank of America National

4    Association U.S.A.

5         Q.    Okay.   So your understanding of that

6    paragraph is that FIA is telling us that they've

7    acquired these three different companies, correct?

8         A.    That is correct.

9         Q.    So I think that goes back to support your

10   prior testimony about this acquisition, correct?

11        A.    Correct.   I know through personal knowledge,

12   but it's always nice when the document spells it out

13   as well.

14        Q.    I hear you.   But my specific question is:

15   Is there any documentation that exists, perhaps in

16   Exhibit number 2, that would establish the fact that

17   Mr. Hadsell had opened an account with MBNA?

18        A.    Again, it's not speaking to how or when he

19   requested the line of credit.   And I really can't

20   speak to what happened between MBNA and Mr. Hadsell

21   before my company even took over the rights to the

22   account.   And FIA Card Services would be the extent of

23   where my knowledge would reach.   So anything that

24   happened in MBNA I couldn't -- I'd be speculating, and

25   that's not what I think you want me here for.

Magic West                    Hadsell v. Mandarich Law Group, LLC

1    Q.    No, sir, I don't want you to speculate.    I

2    know your attorney doesn't want you to speculate

3    either.

4         So to kind of short circuit it, paragraph 1 in

5    the complaint, page 3 of Exhibit number 2, the

6    statement that the original creditor was MBNA America

7    N.A., you don't know if that's correct?

8         A.    I can't speak to it one way or the other,

9    so --

10   Q.    So the answer is you don't know?

11   A.    That would be the best answer I could give.

12   Q.    Is it possible that Mr. Hadsell opened the

13   account with Fleet Bank instead?

14   A.    It's a possibility, because Fleet -- well, I

15   don't want to call it a mess, because that's giving it

16   the wrong context, because obviously it was

17   unorganized.  But Fleet sold off its asset to several

18   different banks, is my understanding.  I know Chase

19   Manhattan picked up a portion of it.  I've seen some

20   portions were picked up by Bank of America.

21        So I can't really specify or speak with any

22   certainty of what happened with Fleet either, so no.

23   Q.    So it's possible that Mr. Hadsell had opened

24   up the account with Fleet Bank?

25   A.    Whether he did or didn't, I don't know.

1    Q.    Okay.  But at least you can testify to the

2  fact that you have no way to tell if it were MBNA,

3  Fleet Bank or somebody else?

4    A.    I wouldn't know the relationship between

5  Fleet and MBNA, so I can't speak that part of their

6  assets were sold off to MBNA or weren't, and part of

7  that was Mr. Hadsell's account, and when MBNA merged

8  with Bank of America it became the rights to it.

9    I really can't go off -- other than the

10  information Bank of America/FIA Card Services provided

11  to us about the origin of the account.  Unfortunately

12  since it was opened in 2004, it's beyond most

13  retention periods as far as a signed request for a

14  line of credit or other information regarding an

15  application or agreement from -- whether it was Fleet

16  or MBNA, to provide a line of credit to Mr. Hadsell.

17    So we're -- I don't have any reason to doubt Bank

18  of America or FIA Card Services' word that -- and

19  documentation that they took over the rights to this

20  account, but I can't speak personally to it.

21    Q.    You don't know personally?

22    A.    Personally I don't know if it was Fleet or

23  MBNA.  I personally do know it was included in a batch

24  sold from Bank of America/FIA to CACH.

25    Q.    Okay.  All right.  Going through the

1    complaint, page 4, Exhibit number 2, I want to draw

2    your attention to paragraph 5 of the complaint.  In

3    paragraph 5 -- we'll break it up a little bit.  But

4    the first sentence, if I could draw your attention to

5    that, if you could read that.  You don't have it read

6    it out loud, just to yourself.

7         A.   Yes, I've read it.

8         Q.   Okay.  And so if you need to take something

9    else in conjunction with this so it's not out of

10   context or something, please let me know.  I'm not

11   trying to hide the ball on you.

12        But the first half of that first sentence, to me

13   it says that Mr. Hadsell had completed a credit card

14   application with MBNA America N.A.  Do you see that?

15        A.   Yes, I do.

16        Q.   What information do you have to believe that

17   that's true?

18        A.   Again, it goes back to what we were just

19   talking about, that Bank of America presented

20   themselves/FIA Card Services presented themselves that

21   they were the correct owner of the account and that it

22   was included in a batch that was sold to CACH.  What

23   happened between the merger of who Mr. Hadsell --

24   sorry.  I shouldn't have said "merger."  Who

25   Mr. Hadsell requested a line of credit from or the

Magic West                    Hadsell v. Mandarich Law Group, LLC

 1   agreement that he had with MBNA or Fleet, I can't

 2   speak to that.

 3        Q.   Okay.  So would it be accurate saying that

 4   as of December 30, 2011, CACH didn't know if

 5   Mr. Hadsell had in fact filled out a credit card

 6   application with MBNA, correct?

 7        A.   Well, I prefer the term "line of credit" or

 8   "request for a line of credit," because an

 9   application, A, we don't know if it was signed, it was

10   an actual hard copy piece of paper or if it was

11   Internet or over the phone.

12        And also, those applications that we fill out by

13   hand, that's not the actual agreement between the bank

14   and the individual, that's just an individual

15   requesting a line of credit.  I could walk into a bank

16   and fill out six applications for a line of credit,

17   doesn't necessarily mean the bank is going to agree to

18   give me a line of credit.  So since there's no real

19   agreement is why I don't like that term.

20        But as far as in this particular case goes, we

21   don't know if it was a hard copy, Internet or what.

22   There was an account that was established.  It was

23   over a period of time that he had this.  Almost six

24   years it looks like.  If someone is receiving

25   statements for an inaccurate account, you think they

Magic West                               Hadsell v. Mandarich Law Group, LLC

1    could have said something.

2         Q.   Well, perhaps and perhaps not.  I'm sure

3    we'll be able to clarify some of that later on.  But

4    my question is specifically as to the credit card

5    application that's referenced in the paragraph 5.  And

6    if I understand your testimony correctly, you have no

7    idea what or if there was even an application filled

8    out.

9              MS. STRICKLER:  I'm just going to object.

10   That mischaracterizes the prior testimony.  He's

11   already answered the question.  You can feel free to

12   answer the question again if you'd like, but --

13             THE WITNESS:  Why don't you repeat your

14   question and I'll give you an answer.

15             MR. SWIGART:  I probably wouldn't be able

16   to.  I'm going to have it read back.

17                  (Record read)

18             THE WITNESS:  Yes, I guess that would be --

19   the closest answer would be correct.  But as I already

20   stated, we don't know if it was a hard copy

21   application, Internet application, which then it's an

22   individual speaking to a computer.  There wouldn't be

23   anything printed out.  A telephone, when those

24   applications are available, we can usually get them,

25   but they look different.

Hadsell v. Mandarich Law Group, LLC

1   obtain.  So if Mr. Hadsell kept it back in 2004, which

2   most people don't, we would have it.  The bank, I

3   would hope, have it.  But by the time we are pursuing

4   in this action, we didn't have the card member

5   agreement that I recall.

6        Q.    Right.  And I know we always play this game

7   when we do our depositions, and I understand you're

8   testifying generally as to your experience and banking

9   and at CACH and your training and experience that

10  you've had with FIA and the related entities, Bank of

11  America.  But you can't testify with certainty that

12  the actual terms and conditions that existed with this

13  account when it was opened, correct?

14       A.    It would be the first account without it

15  that I've ever seen, and but the answer would be no.

16       Q.    Yes, sir.  Understood.  And you were

17  testifying a moment ago as to the general customs and

18  practices of FIA based on your training going through

19  their -- spending some time at their organization and

20  receiving training.  But I think, if I recall from

21  your previous testimony in other depositions, you've

22  never received any training at MBNA, correct?

23       A.    No, because -- well, as I said, they don't

24  exist anymore, and it wouldn't be -- well, it wouldn't

25  be possible, first of all.  And five years ago when I

Magic West                              Hadsell v. Mandarich Law Group, LLC

1   started with the company, if MBNA was still around, it

2   wouldn't have been a good return on investment for us

3   to send an individual to be trained by them if we

4   weren't buying paper from them.

5        **Q.   And the same holds true for Fleet Bank?**

6        A.    That would be true.

7        **Q.   So you can't testify with any level of**

8   **certainty as to if terms and conditions sheets were**

9   **sent out by MBNA to Mr. Hadsell at the inception of**

10  **this account?**

11       MS. STRICKLER:  I'm going to object based on

12  relevance on this entire line of questioning, because

13  it has nothing to do with this lawsuit.  But continue.

14       THE WITNESS:  Short answer would be no.

15  BY MR. SWIGART:

16       **Q.   Understood.  Now, let's -- we're almost done**

17  **here.  Let's talk about this breach of contract claim.**

18       A.    Go ahead.

19       **Q.   Is the breach of contract claim based on a**

20  **breach of the terms and conditions of the account?**

21       MS. STRICKLER:  I'm going to object again

22  based on relevance, but continue.

23       THE WITNESS:  There would have been a breach

24  of contract based on the existence of the account.

25  The terms and conditions we don't have, as we've -- I

1    think we've beaten that horse just about to death.

2    BY MR. SWIGART:

3        Q.    Yes, sir.

4        A.    But every time you swipe a credit card is

5    acceptance of terms and conditions.  To swipe a credit

6    card without being aware of what those terms are,

7    that's the credit line holder's responsibility.  So

8    there would have been a breach of contract even if he

9    had just swiped the card once in a six-year period,

10   because that would be acceptance of the terms and

11   conditions, which as I stated earlier, I have no

12   reason to believe that terms and conditions don't

13   exist.  We just don't have them to offer.  That's what

14   it would have been based off of, would be the breach

15   of contract claim.

16       Q.    Yes, sir.  At the time the state court

17   complaint was filed, did CACH have any knowledge if

18   Mr. Hadsell had swiped that card, if he even had a

19   card?

20       A.    Well, he had a card based on the statements

21   that we --

22            MS. STRICKLER:  I'm going to lodge another

23   objection based on relevance.

24            MR. SWIGART:  Want a standing objection

25   to --

Hadsell v. Mandarich Law Group, LLC

1              MS. STRICKLER:  I'll take a standing

2      objection, because you're analyzing the state

3      complaint which has nothing to do with the complaint

4      in the federal case.  You don't have any of your

5      account stated claims in this particular case.

6              MR. SWIGART:  Okay.  Understood.

7              THE WITNESS:  What I can speak to is

8      Mr. Hadsell was sent statements.  If they were

9      inaccurate, he had a responsibility to dispute them in

10     writing, with the bank preferably.  Obviously he could

11     dispute him on the phone.  But to protect his rights,

12     it would have been in writing.

13         And yeah, there are charges, so that would show

14     that he did swipe the card on the statements that we

15     provided.

16     BY MR. SWIGART:

17         Q.   **But you don't have personal knowledge if he**

18     **actually swiped the card, you're reading the account**

19     **statements?**

20         A.   No.  That's something I'm perfectly happy to

21     say.  I wasn't personally with him when he was doing

22     his grocery shopping or buying gas or whatever.

23         Q.   **All right.  Fair enough.  Fair enough.**

24     **Okay.  And let's scroll through that whole account**

25     **stated thing, which is next.  Been down that road**

**Hadsell v. Mandarich Law Group, LLC**

 1  before.

 2      So the documents in front of you, Exhibit number

 3  2 -- if there's other documents that you need to

 4  reference that aren't here, let me know.  But what

 5  documents are supporting that account stated?

 6          MS. STRICKLER:  I'm going to object.  It's a

 7  legal conclusion.  He's not an attorney.

 8          MR. SWIGART:  Okay.

 9          THE WITNESS:  Yes, as you said, we've gone

10  down this road before.

11  BY MR. SWIGART:

12      Q.    Right.

13      A.    My elementary understanding of what an

14  account stated would be is, the account was opened for

15  a period of time, both parties were aware of the

16  account, that would establish it, and that's kind of

17  where it ends for the most part.

18      Q.    When you say "both parties," you're talking

19  about Mr. Hadsell, and who is the other?

20      A.    Yes, Mr. Hadsell and the bank that was

21  offering the line of credit.  So initially that would

22  have been MBNA, then it would have been FIA Card

23  Services/Bank of America, and then -- well, it

24  wouldn't have been an open line of credit once it was

25  charged off and sold to us.  But that's where the

Magic West                          Hadsell v. Mandarich Law Group, LLC

1    account stated would have come from.  Since CACH is

2    stepping into the shoes, we have the same rights as

3    Bank of America, FIA.  Eventually it would have turned

4    into CACH and Mr. Hadsell, that there was the account

5    stated.

6         Q.    Understood.  Okay.  How about the claim for

7    ten percent interest from March 8 of 2011, do you see

8    that?

9         A.    Yes, I do.

10        Q.    Where did the ten percent come from?

11        A.    My understanding is that's state statutory

12    in California.  May be wrong, but that's my

13    understanding.

14        Q.    Okay.  I'm sure your attorney -- I'm not

15    going to ask you what the law is here in California.

16    I'm looking for a factual basis.  As corollary to

17    that, looking at the loan schedule on page 27, Exhibit

18    number 2, is that in front of you, sir?

19        A.    Yes, it is.

20        Q.    There's a column that says "Interest rate"

21    and there's a number, says "8.9."  Do you see that?

22        A.    Yes, I do.

23        Q.    What does that represent?

24        A.    That would represent the interest rate that

25    was on the account at the time of charge-off.

Page  46

Magic West                              Hadsell v. Mandarich Law Group, LLC

1      Q.    So at the time CACH acquired the account the

2   interest rate was 8.9?

3      A.    That is correct.

4      Q.    Okay.  I won't make you look it up.  But if

5   my review of the records are correct, and correct me

6   if I'm wrong, CACH acquired the account February 9,

7   2011.  I get that from page 21, Exhibit number 2,

8   paragraph 4C.

9      A.    Yes.  I don't see -- the placement date

10  wasn't actually until February 15 which would have

11  been the date it was placed with our affiliate

12  attorney network, and the bill of sale is dated --

13  execution date of February 14, 2011.

14     Q.    Okay.  All right.

15     A.    So as I was touching on earlier, it's all

16  around the same time period.

17     Q.    Okay.  All right.  Just to go through some

18  of the other documents that you've produced in

19  discovery, if we can go back to the page 21, because

20  you have a number 2.

21     A.    Yes.

22     Q.    Reading through this document -- I think

23  we've discussed this before on another date -- there's

24  three account numbers on this document.  Do you see

25  that, sir?

1       A.    Yes, I do.

2       Q.    **How do those relate to Mr. Hadsell, if at**

3  **all?**

4       A.    Those are the account numbers that

5  Mr. Hadsell had through the life of the account.   I

6  think I touched on it a little bit earlier when we

7  were going over the information that would be provided

8  in that loan schedule.   An individual's account number

9  can change.   As much as we like to think that it never

10  does, it can.   That can be for many reasons.   Most

11  banks, including Bank of America, have the policy that

12  when they merge with another financial institution,

13  another bank, they'll change the account number just

14  to discriminate between what happened before them,

15  what happened after them.

16       If you charge off the account, they change the

17  account number.   Or I should say if they charge off

18  the account, nonpayment, they'll change the account

19  number.   If you reported the card stolen, they would

20  change the account number.   It's still tracked through

21  the individual's social security number, but what

22  shows up on the piece of plastic or account statement,

23  that can change.

24       Q.    **All right.   Are there any other documents**

25  **aside from page 21, Exhibit number 2, that have any**

1   reference to the account numbers ending in 9340 or the

2   7588?  Let me just -- you might want to double-check.

3   I looked through the account statements.  I just saw

4   the 1158, and I might be wrong.

5        A.   On the loan schedule the account number

6   ending in 9340 is listed as well as the account number

7   ending in 1158, which the loan schedule comes from

8   a -- not going to say a different source, but a

9   different arm of Bank of America.

10       As I touched on earlier, the loan schedule is

11   strictly computer speaking to computer.  The affidavit

12   of sale is an individual actually going back and

13   looking at the account.  So it's coming from a

14   different -- yeah, I guess "source" is the best word

15   at that point -- a different source, and that's how we

16   can -- that's why we use it to verify the information

17   against the loan schedule.

18       So those two listed, the statements, they're

19   talking about 1158.  But as I stated earlier, this was

20   an account that was open for six years, or almost six

21   years, and we've only got a snapshot of the

22   statements.  I mean, we do have plenty of statements.

23   But compared to what were created over the life of the

24   account, there's more.

25       So I can't speak beyond the affidavit of sale and

Page  49

**Magic West**                           **Hadsell v. Mandarich Law Group, LLC**

1     the loan schedule statements that we may or may not

2     show all the account numbers unless it was around that

3     time period that something was merged, card was stolen

4     or charged off.  We wouldn't see a different account

5     number.

6          Q.    Okay.  But no account statements with the

7     7588 number?

8          A.    Not that I recall.  If you're saying you

9     haven't seen it either in the statements, then that

10    would be my best explanation, is it just wasn't -- the

11    statements that we were provided didn't overlap.

12         Q.    Or a -- the 7588 account number didn't show

13    up in the loan schedule?

14         A.    I didn't go all the way.  No.  My only

15    explanation for that is that the 7588 must have been

16    the MBNA account number, because if you look at -- the

17    1158 is obviously a Bank of America, because it's on

18    the WorldPoints Bank of America as the remit address,

19    and the -- sorry.  9340, that's what I'm looking for.

20    That would be the charge-off account number which is

21    listed on the loan schedule.

22         The number that you're looking for, that's more

23    evidence that it happened before we were able to get

24    the statements.

25         Q.    Is it possible that the 7588 is a completely

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury
that I have read the entire transcript of
my Deposition taken in the captioned matter
or the same has been read to me, and
the same is true and accurate, save and
except for changes and/or corrections, if
any, as indicated by me on the DEPOSITION
ERRATA SHEET hereof, with the understanding
that I offer these changes as if still under
oath.

Signed on the _____ day of _____, 20___.


_____
MAGIC WEST

Page 62

1                   REPORTER'S CERTIFICATION

2

3           I, Angie Messenger, a certified shorthand

4    reporter, in and for the State of California,

5    Certificate No. 11742, do hereby certify:

6

7           That the foregoing proceedings were reported

8    by me stenographically and later transcribed into

9    typewriting under my direction; that the foregoing is

10   a true record of the proceedings taken at that time.

11

12          IN WITNESS WHEREOF, I have subscribed my

13   name this 8th day of October, 2012.

14

15

16

17                        _____

18                        Angie Messenger, CSR No. 11742

19

20

21

22

23

24

25

Page  65