Exhibit C

```
        IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA

                    FOR THE CITY OF SAN DIEGO



CACH, LLC,

                    Plaintiff,

vs.                                   Case No.: 37-2011-0070906-CL-CL-EC

JOE INGYA; DOES 1-10,

                    Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~




                    Deposition of MAGIC WEST

                         March 27, 2012

                      San Diego, California




Reported by: Angie Schultz-Messenger, CSR No. 11742
```

```
1          IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA
2                      FOR THE CITY OF SAN DIEGO
3
4    CACH, LLC,
5                       Plaintiff,
6    vs.                           Case No.: 37-2011-0070906-CL-CL-EC
7    JOE INGYA; DOES 1-10,
8                       Defendant.
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
9
10
11
12
13
14          Deposition of MAGIC WEST, taken on behalf of
15   Defendant, commencing on Tuesday, March 27, 2012, at
16   10:00 a.m., taking place at 701 B Street, Suite 1115,
17   San Diego, California 92101, before Angie
18   Schultz-Messenger, Certified Shorthand Reporter,
19   Certificate number 11742.
20
21
22
23
24
25
```

Page 2

```
 1                    APPEARANCES OF COUNSEL
 2    FOR DEFENDANT:
 3          HYDE & SWIGART
            BY: JOSHUA B. SWIGART, ESQ.
 4          411 Camino Del Rio South
            Suite 301
 5          San Diego, California 92108
            (619)233-7770
 6
 7    FOR PLAINTIFF:
 8          MANDARICH LAW GROUP, LLP
            BY: NATHANIEL CLARK, ESQ.
 9          BY: REBECCA HUNTER, ESQ.
            6301 Owensmouth Avenue
10          Suite 850
            Woodland Hills, California 91367
11          (877)414-0130
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    INDEX OF EXAMINATION
2    DEPOSITION OF: MAGIC WEST
3    EXAMINATION                                              PAGE
4    MR. SWIGART                                                 6
5    MR. CLARK                                                  79
6    MS. HUNTER                                                 79
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1   case to CACH, that gets forwarded to SquareTwo
 2   Financial, and then they get the documents and kind of
 3   goes back through the chain that I just described?
 4        A.   That's my understanding.
 5        Q.   Okay.  But you're not -- as a records
 6   custodian, it's not your job to get these documents
 7   together?
 8        A.   No.  I review the documents that we have,
 9   and I rely on the work of others inside my company.
10        Q.   Okay.  So these documents that you produced
11   today, those are whose documents?
12        A.   They're -- CACH would hold the title to the
13   accounts and the actual documents.  They would be the
14   ones that held them.  But it's through -- in a
15   computer system.
16        Q.   Okay.  This computer system -- I know today
17   in the electronic records day and age, these documents
18   are probably stored electronically, correct?
19        A.   The majority of them, yes.
20        Q.   Okay.  Where were they stored
21   electronically.
22        A.   They're at our Denver office.
23        Q.   SquareTwo?
24        A.   Yes.
25        Q.   So SquareTwo has the electronic records?
```

```
 1       A.    Yes.  They hold them for CACH.
 2       Q.    Okay.  So does CACH ever hold the documents?
 3       A.    Beyond my -- they're the ones that hold the
 4  rights to the account, whether it's on servers at our
 5  office, SquareTwo's Denver office.
 6       Q.    So the documents would be held on the server
 7  at SquareTwo?
 8       A.    That's my understanding, of the ones that
 9  are electronic.
10       Q.    Okay.  All right.  We'll go through that a
11  little bit more later.  Okay.  What about -- well,
12  let's take a look at the document that will probably
13  get us there.  Exhibit -- I guess it would be 3.
14             (Exhibit 3 was marked for identification.)
15  BY MR. SWIGART:
16       Q.    Would be the complaint filed in this case.
17  Make sure I don't have anything else attached.  There
18  you go.  I have a copy for your, sir.
19             MR. CLARK:  Thank you.
20  BY MR. SWIGART:
21       Q.    So Exhibit 3 is a copy of the complaint that
22  was filed in this case, CACH versus my client, Joe
23  Ingya.  Have you seen this document before?
24       A.    Not the actual compliant, no, I haven't.
25  I'm aware that one was filed.
```

```
 1       Q.   Gotcha.  And the authorization that filed
 2  it, the case, that came from CACH?
 3       A.   I'm not aware.
 4       Q.   You don't know if it came from SquareTwo
 5  maybe?
 6            MR. CLARK:  Objection.  Lack of personal
 7  knowledge.
 8  BY MR. SWIGART:
 9       Q.   Do you --
10       A.   I couldn't tell you.  I don't know.
11       Q.   Okay.  All right.  All right.  What about
12  the contents of the complaint, are you aware of what's
13  pled?
14       A.   Yes.
15       Q.   Okay.  Have you reviewed it before your
16  deposition here today?
17       A.   Yes, have.
18       Q.   Do you know the factual basis for some of
19  the cause of action?
20       A.   Yes, that we purchased an account, we're
21  trying to collect on it.
22       Q.   All right.  And again, when you say "we,"
23  who are you talking about SquareTwo, CACH, somebody
24  else?
25       A.   For all intents and purposes of this
```

```
 1   deposition and this case, it will be CACH.  CACH is
 2   the company that filed suit against your client, so
 3   it'll be CACH when I say "we."
 4        Q.   Okay.  Unless you clarify that, referring to
 5   SquareTwo?
 6        A.   Yes.  I'll specifically say SquareTwo if I
 7   mean SquareTwo.  As far as anything in this case is
 8   concerned, it will be CACH.
 9        Q.   Fair enough.  That'll simplify some things.
10   All right.  So this account originated with Bank of
11   America, I take it?
12        A.   Yes.
13        Q.   How did the account come into possession of
14   CACH?
15        A.   It was charged off by Bank of America.
16   Charged off meaning bank washed their hands of it,
17   they put it up for sale to companies like mine.  We
18   purchased it as part of a batch, and it became
19   something that we held the rights to.
20        Q.   Okay.  Does SquareTwo hold the rights to
21   this account?
22        A.   CACH holds the rights.
23        Q.   Okay.  All right.  So they purchased it from
24   Bank of America?
25        A.   That is correct.
```

1      Q.  Okay.  Not to split hairs, did they purchase
2  it from Bank of America or one of its subsidiaries or
3  holding companies?
4      A.  It's purchased through their subsidiaries,
5  FIA Cards Services, which their primary goal or
6  primary function is to handle consumer lines of
7  credit.
8      Q.  Okay.  Fair enough.  So the documents
9  supporting that purchase were produced in Exhibit
10  number 2?
11      A.  Yes, that's correct.
12      Q.  Okay.  Did you get any other document aside
13  from what was produced in Exhibit number 2 from Bank
14  of America?
15      A.  No.  Everything that I've seen in our
16  computer system that we received from Bank of America
17  to date has been provided.
18      Q.  Okay.  Fair enough.  Just looking at the
19  front of the complaint, really CACH is alleging two
20  cautions of action against my client, the first is
21  breach of contract.  Do you see that?
22      A.  Yes, I se that.
23      Q.  Okay.  What's the factual basis for the
24  breach of contract?
25      A.  That there was an account that went into

```
 1   default by lack of payment and we're pursuing it.
 2       Q.   Okay.  When you say "an account," who are
 3   the parties of that account?
 4       A.   The original parties would have been Bank of
 5   America and your client.
 6       Q.   Okay.  And in this day and age, when you say
 7   "Bank of America," you realize that there's different
 8   subsidiaries to Bank of America, correct?
 9       A.   Yes.  As with many banks, there's tens if
10   not 20 different subsidiaries with banks.
11       Q.   Fair enough.
12       A.   It all falls under the same umbrella.
13       Q.   When we're dealing go breach of contract to
14   get some specificity, do you know who the parties of
15   that contract were?
16       A.   The best of your knowledge is Bank of
17   America and the defendant.
18       Q.   Bank of America, N.A.?
19       A.   Sure.
20       Q.   I mean, it says it in the complaint.
21       A.   Yes.  Whether it's Bank of America, N.A. or
22   under some other name, to me, for simplification, is
23   Bank of America.
24       Q.   The holding company?
25       A.   As far as how they have their business set
```

```
 1  up or which arm sold to it to -- transferred it to FIA
 2  Card Services that sold it to us, that's not what I'm
 3  aware of.
 4      Q.   Okay.  Let me ask the question this way.
 5  You down know if the contract between Mr. Ingya and --
 6  was made with FIA Card Services, do you?
 7      A.   What do you mean -- what's your definition
 8  of "contract"?
 9      Q.   Well, let's back up.  You sued for breach of
10  contract, right?
11      A.   Correct.
12      Q.   What did you mean by "breach of contract"
13  when you put it in the complaint?
14      A.   No.  I'm asking a clarifying question of
15  whether you mean a signed application, card member
16  agreement, use of the card?  There's many things with
17  a credit card that can establish a contract.  I wanted
18  to know which you're referring to.
19      Q.   Fair enough.  Let me clarify a little bit.
20  The basis that serves for the formation of the
21  contract that you sued on, do you know what that is?
22      A.   As far as my understanding of how this
23  account was established was through use of the card.
24  There was an account, there was a line of credit
25  issued by Bank of America to the defendant, he got
```

```
 1   goods and services for that card, paid for a period of
 2   time, ultimately failed to keep up with his payments,
 3   the card went into default, which would have been a
 4   breach of contact, as far as my layman's
 5   understanding, because I'm not an attorney.
 6        And then again, it went into a charge-off status
 7   and was sold off so that Bank of America could get
 8   some sort of payment for the account, but they washed
 9   their hands of it.
10        Q.   Sure.  And I appreciate that clarification.
11   I'm not asking you to make any type of legal
12   conclusion or legal basis for what we're talking
13   about.  We're talking about the factual basis of these
14   causes of action.  When you say that there was this
15   line of credit extended, do you have any basis for the
16   facts that gave rise to that extension?
17        A.   The statements that we received shows that
18   there was an account that was established.
19        Q.   Do you have any knowledge as to how that
20   account was established?
21        A.   Whether it was a signed application, an
22   application online or over the phone, that I'm not
23   aware of.
24        Q.   You don't know?
25        A.   I don't know.
```

```
 1        Q.    Okay.  What about the date that that
 2   contract was formed, do you have any knowledge of
 3   that?
 4        A.    The open date that was supplied to us was in
 5   2005.  Yeah, it was 6/9 of 2005 is what my notes
 6   indicate.
 7        Q.    Okay.  And how is that information supplied
 8   to you?
 9        A.    As part of our purchase from Bank of America
10   they give us all the information regarding an
11   individual account that they have, such as an
12   individual's name, social security number, any account
13   numbers that were held through the life of the
14   account, address that they have, phone numbers that
15   are applicable, open dates, charge-off dates, that
16   sort of information.
17        Q.    Fair enough.  So the information that you
18   originally gained from Bank of America had that
19   information that you just described?
20        A.    Yes.  That was part of our initial purchase
21   that was provided to us in electronic file.
22        Q.    But how the contract was formed, be it a
23   written contract, over the phone, on the internet,
24   that wasn't provided to you?
25        A.    Well, the request for the line of credit
```

```
 1                    REPORTER'S CERTIFICATION
 2
 3         I, Angie Messenger, a certified shorthand
 4   reporter, in and for the State of California,
 5   Certificate No. 11742, do hereby certify:
 6
 7         That the foregoing proceedings were reported
 8   by me stenographically and later transcribed into
 9   typewriting under my direction; that the foregoing is
10   a true record of the proceedings taken at that time.
11
12         IN WITNESS WHEREOF, I have subscribed my
13   name this 8th day of April, 2012.
14
15
16
17                            _____
                              Angie Messenger, CSR No. 11742
18
19
20
21
22
23
24
25
```